UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRUMELL TURNER,

                    Petitioner,                    Case No. 2:15-cv-10931
                                                   Hon. Paul D. Borman

v.

THOMAS MACKIE,

                    Respondent.
_____/

## OPINION AND ORDER (1) DENYING AMENDED PETITION FOR WRIT OF HABEAS CORPUS, AND (2) DENYING CERTIFICATE OF APPEALABILITY

This is a habeas case filed by a Michigan prisoner under 28 U.S.C. § 2254.

Petitioner Trumell Turner was convicted after a bench trial held in the Wayne

Circuit Court of two counts of second-degree murder, M.C.L. § 750.317, and

possession of a firearm during the commission of a felony. M.C.L. § 750.227b.

Petitioner was sentenced as a third-time habitual felony offender to 30 to 60 years

imprisonment for each of the murder convictions and a consecutive two-year term

for the firearm conviction.

The petition raises three claims: (1) Petitioner was denied the effective

assistance of trial and appellate counsel, (2) insufficient evidence was presented at

trial to prove that Petitioner was the perpetrator of the crimes, and (3) insufficient

evidence was presented at trial to show that Petitioner acted with malice. The Court will deny the petition because the claims are without merit. The Court will also deny Petitioner a certificate of appealability.

## I. Background

This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *Treesh v. Bagley*, 612 F.3d 424, 430 n.1 (6th Cir. 2010):

> Defendant lived with his girlfriend, Veronica Williams, at her house on Linnhurst in Detroit. Veronica Williams's brother, Reginald Williams, and nephew, Michael Williams, also lived in the house. One morning, when defendant awoke, he noticed that Veronica's Chrysler C had been stolen from her driveway. Defendant suspected that Laron and Demetrious Blakeney were somehow involved in the theft of this vehicle.

> Laron and Demetrious walked by the house on Linnhurst later that same day. Reginald, realizing that these were the two people who defendant believed stole Veronica's car, reported to defendant that Laron and Demetrious were walking past the house. Shortly thereafter, defendant grabbed his gun and got into a car with Reginald. They drove in the direction that Laron and Demetrious were walking. Upon spotting Laron and Demetrious at the corner of Glenwood and Morang, defendant told Reginald to stop the car. Defendant exited the car and confronted Laron and Demetrious. As Demetrious turned to run, defendant shot him four times. Jasmine Simmons, who lived in an apartment near Glenwood and Morang, heard a conversation after the first gunshots. Simmons, who was also Laron's friend, heard Laron's voice state, "I had nothing to do with it." She then heard another voice, which she could not identify, state, "Yes, you did." Then, there was more gunfire, as defendant gunned down Laron. Laron died from gunshot wounds at the corner of Glenwood and Morang.

Meanwhile, Demetrious continued to run until he collapsed at the corner of Casino and Payton. While waiting for an ambulance, Demetrious told police that the person who shot him drove a Chrysler 300C, was new to the area, and lived on Linnhurst near the intersection of Linnhurst and Brock. Demetrious also spoke with his cousin, Jacarri Blakeney and told Jacarri that individuals who drove the Chrysler 300C had shot him and Laron. Jacarri testified that defendant fit all of the descriptions given by Demetrious.

After the shooting, defendant and Reginald returned to the house on Linnhurst. There, defendant informed Michael and Veronica that he had killed someone and that they would need to leave as soon as possible. While in the car, defendant bragged on the phone about killing two people because he was sick of people giving Veronica problems. Defendant later fled to Atlanta.

The trial court convicted defendant of two counts of second-degree murder and felony firearm.

*People v. Turner*, 2013 WL 3198310, at *1-2 (Mich. Ct. App. June 25, 2013).

Petitioner filed a claim of appeal following his conviction and sentence. Petitioner's appellate counsel filed a brief on appeal in the Michigan Court of Appeals that raised one claim:

I. The trial court's verdict was insufficient to support the second-degree murder verdicts.

The Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished opinion. *Id.* Petitioner subsequently filed an application for leave to appeal in the Michigan Supreme Court that raised the same claim. The application was denied by standard order. *People v. Turner*, 495 Mich. 913 (2013) (Table).

Petitioner then commenced the present action by filing a habeas petition and a motion to hold the case in abeyance so he could exhaust his state court remedies with respect to additional claims. (ECF #1, 3.) The Court granted the motion. (ECF #8.)

Petitioner then filed a motion for relief from judgment (*see* ECF #12-9) in the state trial court that raised what now form his first and second habeas claims. The trial court denied the motion for relief from judgment. The court found that review of Petitioner's post-judgment claims were barred from review by Michigan Court Rules 6.508(D)(2) and (3), and it also concluded that the claims lacked merit. (*See* ECF #12-10, pp. 2-3.)

Petitioner filed an application for leave to appeal in the Michigan Court of Appeals that raised the same claims, but the court issued an order denying the application because Petitioner "failed to establish that the trial court had erred in denying the motion for relief from judgment." *People v. Turner*, No. 332263 (Mich. Ct. App. June 27, 2016). Petitioner filed an application for leave to appeal that decision in the Michigan Supreme Court, but it was denied because Petitioner "failed to meet the burden of establishing entitlement to relief under Michigan Court Rule 6.508(D)." *People v. Turner*, 500 Mich. 925 (2017) (Table).

Petitioner then moved to reopen this case by filing an amended petition that raised all the claims he presented to the state courts on direct appeal and post-conviction review. (ECF #9.) The Court reopened the case, (ECF #10), and the parties filed additional briefs. (ECF #11, 13.) The case is now ready for decision.

## II. Standard of Review

28 U.S.C. § 2254(d)(1) curtails a federal court's review of constitutional claims raised by a state prisoner in a habeas action if the claims were adjudicated on the merits by the state courts. Relief is barred under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law.

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam), quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

"[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to

the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003),

quoting *Williams*, 529 U.S. at 413.

"A state court's determination that a claim lacks merit precludes federal

habeas relief so long as 'fairminded jurists could disagree' on the correctness of the

state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011), quoting

*Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "Section 2254(d) reflects the

view that habeas corpus is a guard against extreme malfunctions in the state

criminal justice systems, not a substitute for ordinary error correction through

appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state

prisoner must show that the state court's ruling on the claim being presented in

federal court was so lacking in justification that there was an error well understood

and comprehended in existing law beyond any possibility for fairminded

disagreement." *Richter*, 562 U.S. at 103 (internal quotation omitted).

### III. Analysis

#### A. Procedural Default

Respondent asserts that the claims Petitioner raised on state post-conviction

review are procedurally barred because the state courts relied on Michigan Court

Rule 6.508(D)(3) as grounds for denying him relief. Petitioner asserts that the

ineffectiveness of his appellate counsel constitutes cause to excuse any default.

A habeas court may bypass a procedural default argument and review the merits of potentially defaulted claims, "if [the merits are] easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997). In the present case, the Court deems it more efficient to proceed to the merits of Petitioner's post-conviction claims because the potentially defaulted claims are devoid of merit.

**B. Effective Assistance of Counsel**

Petitioner's first claim asserts that he was denied the effective assistance of counsel at trial during the cross-examination of prosecution witnesses Michael and Reginald Williams, and by his counsel's failure to call his mother, Sharon Turner, as a defense witness. He also asserts that his appellate counsel was ineffective for failing to challenge the effectiveness of his trial counsel on this basis on direct review.

The Sixth Amendment guarantees a criminal defendant the right to the effective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth a two-prong test for determining whether a habeas petitioner has received ineffective assistance of counsel. First, a petitioner must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he was not functioning as counsel as

guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. Second, the petitioner must establish that counsel's deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal. *Id.*

To satisfy the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance." *Id.* at 690. A reviewing court's scrutiny of counsel's performance is highly deferential. *Id.* at 689. There is a strong presumption that trial counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690.

To satisfy the prejudice element, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. On habeas review, a federal court must apply a doubly deferential standard of review: "[T]he question [under § 2254(d)] is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

In the alternative to finding review of Petitioner's ineffective assistance of counsel claims procedurally defaulted by his failure to raise the arguments on

direct review, the trial court also summarily denied the claim on the merits. After reciting the *Strickland* standard, the trial court found "it appears that his argument is merely a critique of trial counsel's strategy with the benefit of hindsight." (ECF #12-10, p. 2.) This summary rejection of Petitioner's ineffective assistance of counsel claims did not result in an unreasonable application of the *Strickland* standard.

1. Cross-Examination of Michael Williams

Petitioner first challenges his counsel's cross-examination of Michael Williams. Petitioner asserts that Michael Williams and his uncle Reginald Williams were the only witnesses to implicate Petitioner in the shooting, that they were probably the true perpetrators, and that it was therefore imperative for defense counsel to challenge the credibility of these two witnesses on every basis available to him.

Michael Williams was certainly one of the key witnesses for the prosecution. He testified at trial to hearing his uncle Reginald tell Petitioner that he saw the two individuals suspected of stealing Veronica Williams' Chrysler 300C walking down the street, to seeing his uncle test fire Petitioner's gun outside the house and hand it back to Petitioner, to seeing his uncle drive Petitioner away in Ms. Williams' other vehicle with his gun, and to hearing Petitioner make incriminating statements about

killing two individuals after returning from the shooting.

Petitioner identifies four areas of impeachment that Petitioner asserts his counsel failed to explore at trial. The Court will address each one separately.

*a. Whether Petitioner or Reginald Williams Drove the Vehicle Before the Shooting*

Petitioner asserts that Michael made inconsistent statements regarding whether Petitioner or his uncle Reginald drove the vehicle to the scene of the shooting. Petitioner asserts that ascertaining who drove to the scene was critically significant because Demetrious Blakeney (the victim who lived long enough to make a dying declaration) said he was shot by the driver.

The Court initially notes that the allegation is based on a false premise. It is not true that Demetrious Blakeney definitively said at the scene that the driver was the shooter. Three witnesses testified to hearing Blakeney's dying words. Officer Jeremiah Orvelo testified that Blakeney said, "that he was at . . . Morang and Glenwood with him and another person when a vehicle pulled up and opened fire on them. . . . He was at the intersection and the vehicle pulled up, stopped, opened first [sic, fire?] at which time he realized he was struck by two bullets and he took off running. . . . He stated the vehicle belonged to the [second house west of Brock on the South side of Linnhurst]." (Bench Trial Tr., 10/24/11, ECF #12-3, pp. 76-77.) On cross-examination, Officer Orvelo was asked, "He told you that the

person that shot him was driving a Chrysler 300?" Orvelo answered, "Correct." (*Id.* at 78.) Officer Kristopher Fisher heard Blakeney say "something along the lines of they pulled up and just started blasting." (*Id.* at 92.) Finally, Jackarri Blakeney, the victim's cousin, testified that he heard the victim say, "the n****s in the 300C had just hit him and Fatboy." (*Id.* at 99-102.)

The record therefore does not reveal a definitive version of the victim's dying declaration. It was not recorded, and none of the three witnesses claimed to remember it verbatim. When Demetrious Blakeney made his statement he was "terrified, panicked, upset, scared. . . . He was afraid that he was going to die. He wanted to hurry up and get to the hospital." (*Id.* at 75-76.)

All that can be fairly taken from the three recollections of Demetrious' dying words is that some of the individuals Demetrious associated with the Linnhurst residence and the Chrysler 300C were the ones who shot him. It is true that the three people who heard his words took the reference to the Chrysler 300C as meaning that the perpetrators were driving that vehicle at the time of the shooting, but it is undisputed that the Chrysler was already stolen at the time of the shooting. Furthermore, Lionel Wincher, another cousin of the victims, testified that he and the victims all referred to the men at the Linnhurst residence as the "300C n****s." Wincher testified that when he and the two victims heard the shots fired earlier that

evening, all three men said they came from the "300C n****s." (*Id.* at 117.)

Contrary to Petitioner's argument, therefore, establishing through Michael Williams' testimony that Reginald Williams and not Petitioner drove the vehicle was not especially significant to determining Petitioner's guilt because it was not a given fact that the driver of the vehicle was also the shooter.

In any event, it was not even necessary for defense counsel to establish that Reginald was the driver through impeaching Michael based on his preliminary examination testimony. Reginald Williams admitted at trial that he was the driver at the time of the shooting. (Bench Trial Tr., 10/25/11, ECF #12-4, pp. 27-28, 31-32). Therefore, to the extent Petitioner could have argued that the driver was the shooter–which, as explained, would have been a specious argument based on a strained interpretation of a dying man's words–Reginald Williams' own admission at trial that he was the driver was far more valuable to the defense then any perceived inconsistency in Michael Williams' testimony.

Finally, defense counsel nevertheless effectively cross-examined Michael Williams on this point at trial. On direct-examination, Michael testified that Petitioner drove his aunt's other vehicle, a red Taurus, and his uncle was in the passenger seat before the fatal shooting. (Bench Trial Tr., 10/24/11, ECF #12-3, pp. 136-37, 139.) Michael confirmed that he told police that Petitioner was the one

who retrieved the keys to the car from his aunt. (*Id.* at 138.)

Then, on cross-examination, defense counsel questioned Michael on the very

point Petitioner claims that his counsel did not address:

Q: [Defense Counsel]: Do you remember testifying at a preliminary examination . . . . August 2nd, 2011?

A: [Michael Williams]: Yes.

Q: Okay. Did you indicate that your uncle was driving the car?

A: Yeah. When they came back.

Q: Page forty-nine. When he came back. But when he left, you're saying that Trumell was driving the vehicle?

A: Yes, sir.

\*　　\*　　\*

Q: And then do you remember being asked . . . Here's the question. It says: "Are you sure that Reginald drove?" And your answer was: "Yes.". . . . Did you say that?

A: Am I sure that Reginald drove? At what point?

Q: Are you sure that Reginald drove?

A: Reggie drove one time and he drove one time. So, what point you talking about?

(Bench Trial Tr., 10/24/11, ECF #12-3, pp. 168- 170.)

The entire exchange was based on testimony during the preliminary

examination that Michael corrected immediately after he understood what was

being asked of him. At the exam, Michael testified that Petitioner was the driver and Reginald was the passenger prior to the shooting, but when they returned from the shooting Reginald was driving. (8/2/11 Prelim. Exam Tr., ECF #12-2, p. 49.) Michael was later asked, "And are you sure that Reginald drove?" He initially answered, "yes," but then he quickly corrected himself and testified, "Not Reginald, Trumell. Trumell got in the driver's side door." (*Id.* at 50.)

Petitioner's claim that Michael could have been impeached with his preliminary examination testimony is therefore simply incorrect. Defense counsel touched on the apparent inconsistency, but as he did at the exam Michael clarified that Petitioner was the driver on the way to the shooting, and that his uncle was the driver when they returned from the scene. The allegation is therefore completely devoid of merit.

*b. Date Michael Learned the Chrysler 300C was Stolen*

Petitioner next asserts that Michael inconsistently testified about the date he learned that the Chrysler 300C was stolen from his aunt. At trial Michael testified that on the morning of the shooting he woke up to find his aunt and Petitioner talking about the vehicle being stolen. (Bench Trial Tr., 10/24/11, ECF #12-3, pp. 131-33.) At Reginald Williams' preliminary examination, Michael testified that he learned of the theft the day before the shooting. ([Undated] Prelim. Exam Tr., ECF

14

#9-1, PgID 156, 175.) He testified though that he was not sure of the date, saying, "as a matter of fact, I think it was like two days, I can't remember." (*Id.* at PgID 156.)

The salient point is that Michael remembered learning that the Chrysler was stolen in close proximity to the shooting. He stated that he was unsure of the exact date at Reginald's preliminary examination, and therefore there did not exist a substantial basis for impeaching his trial testimony that he learned of the theft on the morning of the shooting as opposed to a day earlier. Counsel did not perform deficiently by choosing not to impeach Michael on this inconsequential point.

*c. Route Followed After Shooting*

Petitioner next asserts that Michael inconsistently testified about the route that was taken when they fled from the Linnhurst residence after the shooting. At trial Michael testified that after Petitioner and his uncle returned to the house, Petitioner said "I killed them motherfuckers," and that everyone had to grab their stuff and go. (Bench Trial Tr., 10/24/11, ECF #12-3, p. 141.) Reginald drove, Petitioner was in the front passenger seat, and Michael and Veronica were in the back seat. (*Id.* at 142.) Michael testified that Reginald was dropped off at "some side street," and then Michael was dropped off at his grandmother's house. (*Id.* at 143.)

Petitioner's claim that Michael previously gave an inconsistent account of the route taken relies on a page from the transcript of Reginald's preliminary examination contains that appears to be out of order or incomplete. (*See* [Undated] Prelim. Exam Tr., ECF #9-1, PgID 184.) The page does not pick up from the incomplete sentence closing the prior page, and it starts with a question - "when you guys stopped what happened?" - that does not follow logically from the testimony of the prior page where Michael is testifying about preparing to leave the Linnhurst residence. (*Id.* at 183.)

Nevertheless, on the incomplete page Michael testified that the car "pulled over," that an unidentified "he" got out of the car, and the person then walked to a "street called Camden - something like that," and that "he" was going to "my Auntie Theresa house." (*Id.* at 184.) The transcript then picks up again with Reginald still present, stopping the car between "Chalmers and Hayes," and Reginald then walking away. (*Id.* at 185-86.) Michael recounted that his aunt then took over driving and dropped Michael off at his grandmother's house. (*Id.* at 186.)

No substantial basis for impeaching Michael with this preliminary examination testimony was missed. Petitioner reads the disjointed transcript as if Michael testified that Reginald left the car both at Camden and Chalmers and at Hayes. But again, if Reginald left the car at Camden and Chalmers, he obviously

was no longer present and able to leave the car a second time. It seems far more likely that Michael was testifying to a single stop where Reginald exited the car and walked away, leaving his aunt Veronica to drive him to his grandmother's house. Indeed, Chalmers and Hayes intersect a few blocks south of Camden.

In any event, the difference, if any, between the examination testimony and the trial testimony was not especially significant. The point made was that Reginald left the car before Michael, Veronica, and Petitioner arrived at Michael's grandmother's house. The exact spot that Reginald got out of the car was inconsequential. Michael's trial testimony that Reginald exited at "some side street" was not inconsistent with the examination testimony, and it did not provide a substantial basis to attack his credibility. The allegation is without merit.

*d. Petitioner's Statements After Shooting*

Petitioner next asserts that Michael testified at trial that Petitioner made several incriminating statements after the shooting, but he made no such claim at Reginald's preliminary examination. The record shows, however, that at Reginald's exam, the prosecutor cautioned Michael that "I don't want to know what [Petitioner] said." ([Undated] Prelim. Exam Tr., ECF #9-1, PgID 40.) Michael did not testify to incriminating statements made by Petitioner at Reginald's preliminary examination because he was not asked whether such

statements were made. There was no missed opportunity to impeach his trial testimony.

*e. Counsel Otherwise Effectively Examined Michael Williams*

Contrary to Petitioner's claims, defense counsel's cross-examination of Michael at trial was thorough and effective. Counsel elicited testimony from Michael that he was in custody prior to the incident - meaning he was new to the Linnhurst residence, consistent with Petitioner's claim that the victim said his assailant was new to the area. (Bench Trial Tr., 10/24/11, ECF #12-3, p. 151.) Michael also conceded on cross-examination that he loved his uncle Reginald, suggesting that he might be trying to protect him but had no similar motive to protect Petitioner. (*Id.* at 152.) Defense counsel obtained testimony from Michael that it was Reginald who fired Petitioner's gun earlier and not Petitioner, indicating that Reginald and not Petitioner was the person who tested the apparent murder weapon prior to the crime. (*Id.* at 154-57.) Michael then admitted that he and Reginald were the ones who cleaned up the spent casings around the Linnhurst residence. (*Id.* at 159.) When Michael appeared to hesitate at one point during cross-examination, defense counsel asked him why he was looking at the prosecutor, suggesting that he was fabricating his testimony. (*Id.*) And finally counsel attacked Michael for his failure to speak with police for nearly three weeks

after the shooting. (*Id.* at 163.)

Counsel did not perform deficiently during his cross-examination of Michael, nor has Petitioner demonstrated that there is a reasonably probability that the result of his trial would have been more favorable had his counsel attempted to impeach Michael in the manner asserted.

2. Cross-Examination of Reginald Williams

Petitioner next challenges his counsel's cross-examination of Reginald Williams. Petitioner correctly notes the importance of Reginald Williams' trial testimony to the prosecution inasmuch as he pled guilty to second-degree murder in connection with the incident, and he testified that he was the one who drove Petitioner to the scene of the shootings and witnessed them. Petitioner's claim that his defense counsel failed to adequately cross-examine Reginald by using his prior testimony to impeach him, however, is without merit. The Court will again address each allegation separately.

*a. Living at Linnhurst Address*

Reginald testified at trial that he stayed at the Linnhurst address with his sister from time to time along with staying at his niece's house around the time of the crime. (Bench Trial Tr., 10/25/11, ECF #12-4, pp. 27, 40-43.) Petitioner claims that this testimony ran contrary to Reginald's preliminary examination testimony that he was not living at the Linnhurst address. (8/2/11 Prelim. Exam Tr., ECF #12-

2, p. 9.) Ambiguity in the questions and answers at the two proceedings, however, show that there was not a strong basis for impeachment that was missed by defense counsel.

At the preliminary examination, Reginald was asked: "Did you live at that house?" (*Id.*) Reginald tersely answered, "Nope." (*Id.*) The subject was simply not explored any further at the exam. At trial, the subject was explored in somewhat more depth. Reginald was asked, "Were you ever staying with Ms. Williams during the month of May?" (Bench Trial Tr., 10/25/11, ECF #12-4, p. 27.) Reginald answered, "I think I was staying with my niece." (*Id.*) On cross-examination he then explained that he stayed at the Linnhurst house for "about a week or two" after he got out of jail on May 22. (*Id.* at 37-40.) He stated, "I would stay like a night over at her house and then I'd go over there over to my niece's house, you know. It was like off an on." (*Id.* at 41.)

It is unlikely that impeaching Reginald's trial testimony that he was "staying" at the Linnhurst house from time-to-time on the grounds that he denied "living" at the Linnhurst house at the preliminary examination would have made much weight. Had the matter been pressed at trial, it seems likely that Reginald would have simply explained that he did not view staying at the Linnhurst address off an on for a few weeks as being the same as living there. No substantial ground for impeachment was missed on this point.

*b. Reason for Walking to Corner*

Reginald testified at trial that he walked to the corner near the Linnhurst residence after test-firing Petitioner's gun to see if the police were coming. (Bench Trial Tr., 10/25/11, ECF #12-4, pp. 29-30, 44-47.) At Petitioner's preliminary examination, Reginald did not give a reason for walking to the corner. (8/2/11 Prelim. Exam Tr., ECF #12-2, p. 11.)

Again, no substantial basis for impeachment existed. At the preliminary examination, Reginald was asked, "You walked to the corner? For what?" (*Id.* at 11.) He did not explicitly answer the question but instead responded, "Just walking." (*Id.*) The subject was then dropped at the preliminary examination. On the other hand, at trial Reginald was specifically asked, "What was your purpose for walking down to the end of the block?" (Bench Trial Tr., 10/25/11, ECF #12-4, p. 45.) He answered, "Just walking to see if the police coming down, down the street." (*Id.*)

This is more a case of a one-word answer not being explored further at the earlier proceeding than a case of a witness giving a materially different story. Counsel did not perform deficiently by failing to point out this inconsequential difference in testimony.

*c. Reason for Giving Petitioner a Ride*

At the preliminary examination Reginald testified that he was unaware why Petitioner asked him to drive the car just prior to the shooting, and that he "didn't ask no questions." (8/2/11 Prelim. Exam Tr., ECF #12-2, pp. 14-16, 33.) Petitioner asserts that this testimony should have been brought out at trial to impeach Reginald on the grounds that it was seemingly inconsistent with his having pled guilty to second-degree murder. Petitioner fails to cite any testimony by Reginald at trial that was inconsistent with this statement at the preliminary examination.

Instead, Petitioner asserts that Reginald told Michael Williams that Petitioner said he wanted Reginald to drive him to the store, and that prior statement testified to by Michael was inconsistent with Reginald's trial testimony. The assertion is not supported by the record. At Reginald's preliminary examination Michael Williams testified, "Reginald always telling about his part and said he didn't know what he was doing. . . He said he was supposed to went to the store." ([Undated] Prelim. Exam Tr., ECF #9-1, PgID 186-87.) This testimony is not inconsistent with anything Reginald testified to at trial. He was never asked what *his* purpose for being in the car was. It is entirely consistent with Reginald's trial testimony that he initially intended on driving his sister's car to the store when Petitioner got into the car. Nor is it surprising that before any arrests were made Reginald attempted to minimize his role when he talked about the incident with his nephew and sister. Again, no significant opportunity to impeach Reginald was

22

missed.

*d. Counsel Otherwise Effectively Examined Reginald Williams*

Instead of raising these three insubstantial points, a fair reading of counsel's cross-examination of Reginald shows that counsel effectively presented Petitioner's defense that Reginald and Michael were the two true perpetrators.

Rather than suggest that Reginald lied about living at the Linnhurst address, trial counsel instead elicited testimony from Reginald that he had argued with Petitioner, and that Reginald was asked to leave the house as a result. (Bench Trial Tr., 10/25/11, ECF #12-4, pp. 38-40.) Establishing a motive for Reginald to feel antipathy towards Petitioner, as counsel attempted to do, was far more valuable to the defense than getting into a semantics debate about whether Reginald "lived" or "stayed" at the residence.

Defense counsel also obtained an admission from Reginald at trial that he fired an entire clip from the gun just prior to the crime, allowing defense counsel to argue that Reginald - the man who test-fired the gun - was also more likely the shooter during the crime. (*Id.* at 44-46.)

Contrary to Petitioner's argument, defense counsel did not ignore the fact that Reginald minimized his involvement or knowledge of Petitioner's intent yet pled guilty to second-degree murder. Defense counsel leaned heavily on Reginald's plea deal as providing a motive to shift blame onto Petitioner. (*Id.* at

52-55.) Defense counsel harped on the implausibility of Reginald's testimony that he told Petitioner about seeing the two eventual victims walk down the street for no reason, that he test-fired the gun for no reason, and that he then agreed for no known reason to drive Petitioner to the location where the victims were gunned-down. All of this allowed defense counsel to forcefully argue in closing argument that Reginald was the true culprit. (Bench Trial Tr., 10/25/11, ECF #12-4, pp. 115-119.)

On this record, the Court finds that defense counsel did not perform deficiently in the manner he conducted the cross-examination of Reginald Williams or presented Petitioner's defense that Reginald and Michael were the perpetrators.

3. Michael and Reginald Williams Not Only Witnesses to Implicate Petitioner

It worth noting that Petitioner's premise that the prosecutor's case hinged entirely on the credibility of Michael and Reginald Williams is dismissive of the complete record. While it is true that the testimony of these two witnesses was very important to the prosecutor's case, they were not the only ones to implicate Petitioner in the murder.

Pierre Goss testified that he was also at Veronica Williams' house on the evening of the shooting. (Bench Trial Tr., 10/25/11, ECF #12-4, pp. 6-7.) He saw Petitioner at a restaurant with Veronica that afternoon, and Petitioner told Goss

about the stolen car. (*Id.* at 5.) Later, Petitioner drove with Goss to a store in Veronica's Taurus, and when they passed by a group of men Petitioner "grimed" the men and told Goss that "it's going to be some problems." (*Id.* at 7-8.) When they arrived back at Veronica's house, Michael Williams took a handgun from Petitioner, shot-off rounds, and then Michael gave the gun back to Petitioner. (*Id.* at 9.) Goss' testimony belied Petitioner's testimony that he was not armed with a gun on the date of the shooting and that he was unaware or unconcerned about Veronica Williams' stolen vehicle, and it suggested his antipathy towards the group of men seen on the street.

Lionel Wincher testified at trial that he was the victims' cousin. (Bench Trial Tr., 10/24/11, ECF #12-3, pp. 114-15.) He was with them on the evening of the shooting, and he walked past Veronica Williams' house with the victims twice prior to the shooting. After all three passed by the Linnhurst house the first time and heard the first series of gunshots, they all identified the shooters as the "300C n****s." (*Id.* at 117.) Wincher identified Petitioner as one of the men standing on the porch before they heard the shots. (*Id.* at 118.)

Wincher's testimony therefore indicated that he and the victims identified or associated the men living at the Linnhurst residence with the Chrysler 300C. It explained or at least suggested that Demetrious' dying declaration that the men who shot him were the ones driving a 300C and living on Linnhurst was not a

statement that the perpetrators were driving the 300C at the time of the shooting, but rather that it was a product of the dying man's efforts to identify the shooter based on the only thing he knew about them - that they lived at the second house on Linnhurst and had been seen driving a Chrysler 300C.

Meanwhile, Jackarri Blakeney, like the two officers who heard Demetrious Blakeney's dying words, testified that Demetrious identified the "330C n****s" as the men who "hit him and fat boy." (Bench Trial Tr., 10/25/11, ECF #12-4, p. 99.) Jackarri knew this to be a reference to the men living at the Linnhurst residence. (*Id.*) He and the victims had been "mean mugged" by them before. (*Id.* at 100.)

In other words, the case against Petitioner did not hinge entirely on attacking the credibility of Michael and Reginald Williams, as Petitioner claims. Counsel's failure to raise the inconsequential claimed inconsistencies between Michael and Reginalds' prior testimony and their trial testimony was not deficient and did not prejudice Petitioner's defense. Instead, counsel presented as forceful an argument as possible that Reginald and Michael were the true perpetrators, and that they falsely accused Petitioner to shift blame away from themselves.

4. Failure to Call Sharon Turner

Petitioner next asserts that his counsel was ineffective for failing to call his mother, Sharon Turner, to testify that Petitioner never called her bragging about committing the murders. Once again, this claim hinges on a false premise.

Petitioner claims that Michael Williams testified that Petitioner called his mother to brag about the murders during the car ride away from the Linnhurst residence. The record shows, however, that Michael did not know who Petitioner was calling. Michael testified at the preliminary examination, "And then we got in the car and [Petitioner] was on the phone. I think he was talking to somebody, his brother, somebody. He was like, yeah, I just killed two mother f-ers." (8/2/11 Prelim. Exam Tr., ECF #12-2, p. 43.) Michael then testified, "And he was on the phone with his mamma, saying like, yeah, such, such, such, I just killed two people, I just killed two people." (*Id.* at 44.) At trial, Michael testified, "I think he was calling his mother. He was like I killed two motherfuckers." (Bench Trial Tr., 10/24/11, ECF #12-3, p. 144.) He recalled, "I think he's on the phone, calling his mother and his brother. He like I'm tired of people fucking with Roni. . . ." (*Id.* at 145.)

Michael Williams did not testify that he knew that Petitioner called his mother. He only heard Petitioner's side of the conversation. He qualified his testimony several times that he *thought* Petitioner was talking to his mother or his brother. Calling Sharon Turner to testify that Petitioner did not call her, if believed, would only have established that Michael was incorrect in his assumption that Petitioner was talking to his mother. It would not have demonstrated that Petitioner did not place a call bragging about murdering two people. Counsel did not perform

27

deficiently by failing to call Petitioner's mother in his defense, nor has he shown a reasonable probability of a more favorable outcome had she been called.

5. Appellate Counsel

Petitioner claims that his appellate counsel was ineffective for failing to raise the foregoing claims of ineffective assistance of trial counsel claims on direct appeal. "[B]y definition, appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit[.]" *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001). As none of Petitioner's allegations of ineffective assistance of trial counsel have merit, his appellate counsel was not ineffective for failing to raise them on direct review.

Petitioner's first claim therefore does not provide a basis for granting habeas relief. The state trial court's summary rejection of the claim on the merits was not contrary to, and did not involve an unreasonably application of, the clearly established Supreme Court standard.

**C. Sufficiency of the Evidence**

Petitioner's second and third claims challenge the sufficiency of the evidence presented at trial to sustain his convictions. His second claim asserts that insufficient evidence was presented to prove beyond a reasonable doubt his identity as the perpetrator of the shootings, and his third claim argues that there was an absence of evidence demonstrating that he acted with malice.

Under clearly established Supreme Court law, "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Nevertheless, the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is, "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 318. "[T]his inquiry does not require a court to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id*. at 318-19 (emphasis in original) (quoting *Woodby v. INS*, 385 U.S. 276, 282 (2010)). "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 318-19 (emphasis in original) (citation omitted).

"[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011). Instead, the federal court may grant habeas relief "only if the state court decision was 'objectively unreasonable.'" *Id*. (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)). "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be

mistaken, but that they must nonetheless uphold." *Id*. Therefore, for a federal habeas court reviewing a state court's sufficiency of the evidence evaluation, "the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 566 U.S. 650, 656 (2012).

After reciting the controlling Supreme Court standard, the Michigan Court of Appeals rejected Petitioner's sufficiency of the evidence claim on the merits during his appeal of right. *Turner*, 2013 WL 3198310, at *2-3. The state court decision was not unreasonable.

With respect to the claim that insufficient evidence was presented identifying Petitioner as the shooter, the argument once again relies on a faulty premise. Petitioner starts with the most narrow interpretation of Demetrious Blakeney's dying words possible: that the perpetrator was driving in a Chrysler 300C when he was shot, and that the shooter was the driver of the vehicle. From this premise, Petitioner argues that he could not have been the shooter because it was undisputed that Veronica Williams' Chrysler 300C was already stolen at the time of the murder, and because Reginald Williams admitted at trial to being the driver of her other vehicle at the time of the shooting.

The argument places a rather unfair standard of precision on a dying man's last words. As indicated above, Jackarri Blakeney and Lionel Wincher testified that

the victims associated the men staying at the Linnhurst residence with the Chrysler 300C. When they heard the shots being fired earlier in the evening, they said to each other that it was the "300C n****s." (Bench Trial Tr., 10/24/11, ECF #12-3, p. 117.) And again, contrary to Petitioner's argument, Demetrious Blakeney did not definitively say that the shooter was the driver. Officer Orvelo heard him say that a "vehicle pulled-up and opened fire on them." (*Id.* at 76-77.) It was defense counsel who deftly asked Orvelo on cross-examination,"He told you that the person that shot him was driving a Chrysler 300?" (*Id.* at 78.) In any event, Officer Fisher recalled the dying words to be more general, "something along the lines of they pulled up and just started blasting." (*Id.* at 92.) Finally, Jackarri Blakeney testified that Demetrious said, "the n****s in the 300C had just hit him and Fatboy." (Bench Trial Tr., 10/24/11, ECF #12-3, p. 99.) Demetrious did not definitively say that the man who shot him was the driver of the vehicle. The argument is without merit.

In any event, Reginald Williams testified that he personally witnessed Petitioner commit the murders. (Bench Trial Tr., 10/25/11, ECF #12-4, pp. 31-34.) Michael Williams testified that he heard Petitioner say multiple times that he killed two individuals immediately after the shooting. (Bench Trial Tr., 10/24/11, ECF #12-3, pp. 141-146.)  The testimony of Pierre Goss, Lionel Wincher, and Jackarri Blakeney also corroborated the identification of Petitioner as the perpetrator and

established the stolen vehicle as the motive for the shooting. Finally, the testimony of the medical examiner and the police officers describing the scene and the condition of the bodies strongly indicated that the shooting was performed with an intent to kill, or at a minimum with an intent to do great bodily harm.

It is the responsibility of the fact-finder and not a court reviewing a sufficiency of the evidence claim to decide what conclusions should be drawn from the evidence admitted at trial. *Cavazos v. Smith*, 565 U.S. 1, 2 (2011). A reviewing court does not re-weigh the evidence or re-determine the credibility of the witnesses whose demeanor was observed by the trial court. *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). In light of the testimony provided by Reginald and Michael Williams, whose testimony the trial court accepted as true, as well as the other witnesses discussed above, ample evidence was presented at trial to demonstrate beyond a reasonable doubt that Petitioner acted with malice when he shot and killed the two victims.

The decision of the Michigan Court of Appeals rejecting Petitioner's sufficiency of the evidence claim "was [not] so insupportable as to fall below the threshold of bare rationality." *See Coleman*, 566 U.S. at 656.

Because none of Petitioner's claims merit relief, the petition will be denied.

## IV. Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability issues. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Courts must either issue a certificate of appealability indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b); *In re Certificates of Appealability*, 106 F.3d 1306, 1307 (6th Cir. 1997).

To receive a certificate of appealability, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotes and citations omitted). Here, jurists of reason would not debate the Court's conclusion that Petitioner has not met the standard for a certificate of appealability because his claims are devoid of merit. Therefore, the Court denies a certificate of appealability.

### V. Conclusion

Accordingly, the Court 1) **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus, and 2) **DENIES** a certificate of appealability.

IT IS SO ORDERED

s/Paul D. Borman

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: March 8, 2019